IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-HC-2100-FL

| | | |
|---|---|---|
| BOBBY RAY GRADY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| NC DEPARTMENT OF PUBLIC | ) | |
| SAFETY, | ) | |
| | ) | |
| Respondent. | ) | |

The matter now comes before the court on respondent's motion for summary judgment (DE 21) pursuant to Federal Rule of Civil Procedure 56. The motion was fully briefed. The matter also is before the court on petitioner's motion for rehearing (DE 34), to which respondent did not respond. In this posture, the issues raised are ripe for adjudication. For the following reasons, the court denies petitioner's motion for rehearing and grants respondent's motion for summary judgment.

**STATEMENT OF CASE**

On May 6, 2014, petitioner was convicted, following a jury trial in the Wayne County Superior Court, of first-degree rape, first-degree sex offense, and first-degree kidnaping. (Resp't's Mem. Ex. 2, pp. 62-64). The superior court judge consolidated the first-degree rape and first-degree sex offense convictions into a single judgment and imposed a presumptive-range sentence of 317 to 390 months imprisonment. State v. Grady, No. COA15-433, 2016 WL 2659505, at *7 (2016). The trial court arrested judgment on the first-degree kidnaping charge and sentenced defendant for

second-degree kidnaping to a consecutive presumptive-range term of 33 to 49 months imprisonment. Id. Petitioner subsequently filed a notice of appeal to the North Carolina Court of Appeals. See id. The court of appeals entered an order finding no error on May 10, 2016. Id. at *14. On August 18, 2016, the North Carolina Supreme Court denied petitioner's *pro se* petition for discretionary review and dismissed his notice of appeal. State v. Grady, 792 S.E. 2d 788 (N.C. 2016) (table opinion).

On May 9, 2016, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, petitioner alleged the following: (1) he was not competent to represent himself at trial; (2) he lacked the mental capacity to commit the offenses; and (3) his conditions of confinement are unconstitutional. Petitioner subsequently filed a pleading captioned "motion to amend evidence," which the court granted. Petitioner, additionally, filed a motion for an evidentiary hearing and a jury trial, as well as a motion for a temporary restraining order. The court denied petitioner's motions. As part of its order, the court noted that plaintiff raised claims challenging the conditions of his confinement in his motion for a temporary restraining order, and directed the clerk of court to send petitioner the civil rights package.

In the interim, respondent filed a motion for summary judgment arguing that petitioner is not entitled to habeas relief. Petitioner responded to the motion for summary judgment and filed a pleading captioned "Motion for Rehearing of Preliminary Injunction and Restraining Order." Respondent did not respond to petitioner's motion.

### STATEMENT OF FACTS

The facts as stated by the North Carolina Court of Appeals are summarized as follows:

> On 13 March 2011, Jane Smith[] worked a shift from 7:00 p.m. to 2:00 a.m. as a supervisor at an internet sweepstakes business in Kinston, North Carolina. At about 2:00 a.m. on 14 March 2011, Mrs. Smith locked up at work and left to head home. As she was driving

home on Highway 70, she approached Bill Lane Boulevard, but could not move into the right turn lane for Bill Lane Boulevard because it was blocked by a red BMW, with defendant sitting in the driver's seat of that vehicle with the door open. Mrs. Smith cracked her window and asked defendant if everything was okay, and he said he could not get anybody on his cell phone and was stuck. Defendant asked Mrs. Smith if she could help him move his car to the side of the road, and she did. Although it was dark, Mrs. Smith could see defendant's face because of the lights from the cars. Afterwards, defendant asked if Mrs. Smith could give him a ride to his home off Emmaus Church Road, and since Mrs. Smith lived off that road, she agreed.

When they turned onto Emmaus Church Road, defendant said that he lived in the second trailer on the right. As Mrs. Smith started to slow down and approach the trailer, defendant leaned over and held a sharp object against Mrs. Smith's throat. Mrs. Smith could feel it cutting her skin. Defendant told her to make the next right onto Casey Mill Road and pull off at the speed limit sign. Defendant, still holding a knife to Mrs. Smith's throat, asked her to turn off the car and its lights. He then opened the passenger door to Mrs. Smith's minivan and told Mrs. Smith to get out through that door.

After exiting the car, defendant, while still holding the knife to Mrs. Smith's throat, made her sit on the ground. Defendant unzipped his pants and forced Mrs. Smith to perform oral sex on him. Defendant then made Mrs. Smith lay down on the ground, remove her pants and underwear, and performed oral sex on her, with the knife at her leg. After that, defendant engaged in vaginal intercourse with the knife held at Mrs. Smith's throat. Defendant pulled out and ejaculated on the ground and then unsuccessfully tried to burn that part of the ground with his lighter. A car drove by, and defendant lay on top of Mrs. Smith so she could not move.

Defendant told Mrs. Smith to get dressed and get back in the car. He then said, "I'm not going to kill you, but I was supposed to, it's part of a Blood initiation." Defendant made Mrs. Smith drive him back to his red BMW, and on the way he said, "Don't forget, don't tell or I will kill you." After dropping defendant back off at his car, Mrs. Smith "turned around and floored it out and left."

Mrs. Smith drove past her neighborhood first because she was worried defendant might be following her, but eventually she went home and woke up her husband and told him what had happened. She

did not want to call the police because she was worried defendant was going to find her and kill her, but her husband called 911 anyway. When Deputy Michael Biggins of the Wayne County Sheriff's Office arrived, about 15 minutes later, Mrs. Smith told him that her attacker was "a tall, black male, about six foot, between 150 and 200 pounds, and he had an extreme lazy eye and looked like he had a broken nose." Mrs. Smith then went to the hospital, where a rape kit was completed and the examination noted two horizontal scratches on Mrs. Smith's neck.

Deputy Biggins thought Mrs. Smith had described someone he had encountered several times, but he could not recall the man's name. He did remember an address associated with the man since he had been to the address several times. Deputy Biggins called the dispatch office and had them look up the address and read off names associated with it—that search led to defendant's name.

Deputy Biggins contacted Deputy Kenneth Lupton of the Wayne County Sheriff's Office, his sergeant at the time, and asked him to go to the Bill Lane Boulevard area identified by Mrs. Smith and see if he could locate the red BMW. Law enforcement officers found a red BMW at the location Mrs. Smith described and had a wrecker take it to a secure location. The vehicle was registered to Linda Grady Johnson at the address Deputy Biggins had recalled.

The following day, 14 March 2011, Mrs. Smith received a call asking her to go to the sheriff's annex. While at the annex, Mrs. Smith identified defendant in a double-blind photographic lineup, presented to her by Detective Tammy Odom Mozingo of the Wayne County Sheriff's Office. Detective Mozingo acted as the lineup administrator and knew nothing about the case or which person in the lineup was the suspect. Mrs. Smith wrote on defendant's picture in the lineup: "Not one hundred percent, but pretty close." Detective Mozingo asked Mrs. Smith to be more accurate with the percentage amount, so Mrs. Smith added "I'm ninety percent sure."

After Mrs. Smith identified defendant in the photographic lineup on 14 March 2011, defendant was arrested. At defendant's probable cause hearing on 16 May 2011, where defendant was represented by counsel, defendant told the court that Mrs. Smith was willing during all the sexual acts, that defendant did not have to force anything, and that Mrs. Smith was the one pushing it.

DNA test results of the external and internal vaginal swabs taken during Mrs. Smith's rape kit exam were inconclusive. The results excluded Mrs. Smith's husband, but the samples were of "insufficient quality or quantity" to exclude defendant. The sample taken from her underwear could not exclude either Mrs. Smith's husband or defendant.

On 16 March 2011, defendant indicated he wanted to waive counsel, but on the waiver of counsel form, in place of his signature on the form, he wrote, "I refuse to sign." Defendant was still represented during the preliminary hearing by Kenneth Rouse. Mr. Rouse filed a motion to withdraw as defendant's counsel on 25 May 2011, attached a handwritten motion from defendant, and stated it was clear from the motion that defendant was "plainly expressing he does not want court appointed counsel." Upon Mr. Rouse's withdrawal, William Bland was appointed to represent defendant. On 16 June 2011, Mr. Bland moved to withdraw from representation of defendant, citing a conflict of interest for his firm, and Jim Copeland was appointed as defendant's counsel.

When Mr. Copeland met with defendant, it was clear that defendant did not want Mr. Copeland or anyone else representing him, so Mr. Copeland moved to withdraw, and his motion was granted at a hearing on 20 July 2011. At the hearing on 20 July 2011, Judge Arnold O. Jones II asked defendant if he understood his right to counsel, to which defendant responded, "Yes." Judge Jones then asked defendant if he wanted a lawyer appointed for him, if he wanted to represent himself, or if he wished to hire his own lawyer, to which defendant replied: "Represent myself, sir." On the waiver of right to counsel form, however, defendant once again wrote in place of his signature, "Refuse to sign." Judge Jones then expressed concern that defendant "may not fully understand the gravity of what's going on" and decided to send defendant to Central Regional Hospital for a psychological evaluation.

In his order committing defendant to Central Regional Hospital Raleigh Campus to be examined on his capacity to proceed, Judge Jones wrote that "[t]he court needs to have the Defendant's capacity to (1) understand/comprehend rights to counsel and the effect of not having counsel[;] (2) understand the proceedings against him[;] (3) represent himself at pretrial/trial." The psychological evaluation was conducted on 25 August 2011 by Senior Psychologist Nancy E. Laney. In her 8 November 2011 report, Dr. Laney concluded that defendant was capable of proceeding to trial and that defendant

"appreciates his decision to represent himself versus allowing a public defender to represent him."

In explaining her conclusions, Dr. Laney stated that defendant had "no history of intellectual impairment or cognitive difficulties." Dr. Laney did state that defendant had a history of substance abuse and sought mental health treatment for various self-reported mood symptoms, and at times he reported psychotic symptoms such as hallucinations and paranoia, but he was never observed to be actively psychotic. Dr. Laney noted, in relation to defendant's self-reported symptoms, that they "led to diagnosis of mental illness and a legal determination of Not Guilty by Reason of Insanity in the State of Florida [,]" but she went on to state that "these diagnoses were questioned numerous times by multiple providers."

On 8 February 2012, Charles Gurley was appointed to represent defendant. Mr. Gurley, however, moved to withdraw on 13 March 2012, on the grounds of lack of communication and that defendant was trying to advise him on what motions to file and what law to file.

In a hearing on 4 September 2012 before Judge Jones, defendant renewed his request to proceed pro se. Judge Jones asked defendant whether he still understood the charges against him and wished to proceed pro se and found that he did. Judge Jones then engaged in the following colloquy with defendant:

> THE COURT: All right. I've got a few more questions.
>
> Do you understand that you have a constitutional right to be represented by a lawyer?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you understand if you want a lawyer and you can't afford a lawyer, I have and I will continue to appoint you a lawyer to represent you in this case?
>
> THE DEFENDANT: Yes, sir.

THE COURT: Do you understand if you decide—and you can change your mind at any time. We're not done with this yet. But if you decide to represent yourself, I will not give you legal advice concerning any legal defenses, jury instructions, or any other legal issue that may be raised at a trial. Do you understand that?

THE DEFENDANT: I understand, sir, that you can't do that because you're impartial.

Judge Jones then asked defendant again if he understood what he was charged with, to which defendant first stated, "No, sir[,]" but then acknowledged that the judge had previously told him the charges and their maximum penalties. After reciting the charges another time, the trial judge asked again if defendant understood the charges, and defendant replied, "I know—I know I'm charged with it." Finally, the trial judge asked defendant whether he still wished to represent himself, and after some initial confusion as to whether he would be heard on a motion to dismiss, defendant replied: "I would like to represent myself, Your Honor."

After that colloquy, Judge Jones made the following findings:

THE COURT: I must—I find that a request to proceed pro se must be clear and unequivocal in order for me to act on that. And he has made a clear and unequivocal request. I have made what I think is more than a proper inquiry this morning. I think I've asked the questions that the Supreme Court of North Carolina has required me to ask. And I've gone beyond that.

I'm finding that he has waived his rights to assignment of counsel and to all counsel.

. . . .

I find that the only basis for denying a waiver is that his decision to waive is not knowing, voluntary, and intelligent. A decision to deny waiver cannot be based on his ability to present an effective defense because, for example, he has limited education or intellectual functioning. And I find he meets that standard, in that I find that I do not have the basis to deny him his constitutional right to represent himself, based on everything I've read and heard today.

Prior to today, there was a request made to—or a decision made to have him evaluated, and I have received a copy of that evaluation and have made reference to that evaluation, and have considered that as part of my ruling today.

So I'm going to allow the motion to withdraw on behalf of Mr. Gurley. And I'm going to find, based on—I'm making—just incorporate everything that I've heard today and findings I've just made that the defendant, Mr. Grady, is exercising his constitutional right to represent himself. And based on everything I've heard, I'm going to allow that motion.

In addition, Judge Jones, after granting Mr. Gurley's motion to withdraw, appointed Mr. Gurley as defendant's standby counsel.

During the pre-trial phase, defendant filed numerous motions, as well as various civil actions in state and federal court against two judges, the district attorney and assistant district attorney, and defendant's

lawyers. On 22 July 2013, defendant's case was set for trial, but before it could proceed, presiding Judge William Pittman stated that he had "serious concerns" about whether defendant could "represent himself or assist in the representation of himself in a rational or reasonable manner."

Judge Pittman ordered a competency hearing for 9 September 2013 and requested that Dr. Laney be subpoenaed to testify at that hearing. At the hearing on 9 September 2013, Judge Jones was presiding and heard testimony from Dr. Laney. Judge Jones ordered that defendant be re-evaluated by Dr. Laney for two reasons: (1) to review Dr. Laney's previous findings regarding defendant's capacity to proceed to trial; and (2) to evaluate defendant's capacity at the time of the alleged offenses.

Dr. Laney re-evaluated defendant on 18 October 2013, and her opinions were set out in two separate reports dated 11 December 2013. The first report dealt with whether defendant had the ability to form the mental intent to commit the alleged offenses on 14 March 2011 and found that there was "no sufficient basis to indicate that [defendant] suffered from a mental disease or defect" at the time of the alleged offenses. Dr. Laney prepared a separate report re-evaluating defendant's current capacity to understand the nature and object of the proceedings against him, to comprehend his own situation relating to the proceedings, and to assist in his own defense in a rational or reasonable manner. At the conclusion of that 11 December 2013 report, Dr. Laney stated that her opinions "have not changed" and that she had still concluded that defendant was capable of proceeding to trial.

On 3 February 2014, Judge Jones conducted a competency hearing, with defendant representing himself pro se and Mr. Gurley present as standby counsel. At the hearing, defendant sought to preserve the confidentiality of the records of his mental health evaluations, and the trial court assured him that the reports would be sealed. Defendant further sought to have the courtroom cleared except for essential witnesses, and included in his request that the victim not be allowed to remain in the room, which Judge Jones declined to rule on until such point as particular questions of witnesses raised issues to which defendant wished to object. Defendant never made any such objections.

Dr. Laney then proceeded to testify and summarized her findings that defendant was competent to proceed to trial and assist in his defense,

that defendant understood and appreciated his decision to represent himself versus having a public defender represent him, and that on the night of the offenses in issue, defendant was capable of forming the specific intent to commit the alleged offenses. Judge Jones adopted Dr. Laney's findings as findings of the court, and concluded that defendant "is capable of proceeding to trial, comprehending his own situation, and has the ability and capability to understand the nature and . . . object of the proceedings against him." Judge Jones also found that defendant "had the capacity at the time of the alleged offenses to form the mental intent to commit the alleged offenses."

Before the conclusion of the 3 February 2014 hearing, the State referred to "new case law," Edwards, and suggested that it "probably requires the Court to ask some additional questions about the issue of effective waiver of counsel, so we may need to have another hearing another time to address that issue." Defendant also asked Judge Jones to rule on his "Judicial Notice of Adjudicated Facts," which included numerous handwritten pro se motions. Judge Jones declined to consider these motions and stated that they should be heard by the trial judge.

Defendant's case was brought to trial on 21 April 2014 before Judge Ebern T. Watson, III. Defendant actively participated in the trial proceedings. He moved for and was granted full recordation of the trial proceedings. Prior to jury selection, defendant raised his remaining pre-trial motions, including the "Judicial Notice of Adjudicated Facts," and Judge Watson informed him that he would save time to address those after jury selection but before the jury was empaneled. Defendant moved for a special venire via questionnaire sent to the potential jurors, which was denied. Defendant moved to sequester the witnesses, and with a few exceptions, such as for the victim, the trial court granted the motion, effective once the jury was empaneled. Defendant also actively participated in jury selection.

Defendant represented himself during opening statements and the beginning of the State's direct examination of its first witness, Mrs. Smith; but eventually, during that direct examination, defendant asked for his standby counsel, Mr. Gurley, to take over the case. Judge Watson explained to defendant that if he wanted Mr. Gurley to take over, he would be his attorney and first counsel from that point forward. Further, Judge Watson stated:

THE COURT: No. Listen, if you—if you're choosing to now tell me in open court that you believe you have reached a point in this litigation where you no longer are satisfied representing yourself because things have come up for determination that you believe may be beyond your experience level or exposure level, and Mr. Gurley is in a better position, knowing what the tactics are that are involved in litigation, if you believe that it's in your best interest to have him appointed in your case to represent you, I will do that. But, you must understand, once that change takes place, he will take the helm, and he will remain as the only litigator in your case. You and he can converse about anything at any time you choose to. And by him doing this, it doesn't forfeit at all anything that's already been offered by you in at any preliminary hearings or any matters that the Court has been asked to take notice of at this point.

And defendant responded, "Yes, sir."

During trial, Mrs. Smith identified defendant as the person she saw in the red BMW, and when asked if defendant was the person who kidnaped her, forced her to perform oral sex, performed oral sex on her, and raped her, she stated she was "[one] hundred percent" certain that he was. At the conclusion of the trial, the jury found defendant guilty of all three counts of first degree rape, first degree sexual offense, and first degree kidnaping.

Judge Watson consolidated the first degree rape and first degree sex offense convictions in a single judgment and imposed a presumptive-range sentence of 317 to 390 months imprisonment. The trial court arrested judgment on the first degree kidnaping charge and sentenced defendant for second degree kidnaping to a consecutive presumptive-range term of 33 to 49 months imprisonment. Defendant timely appealed to this Court.

Grady, 2016 WL 2659505, at *1-7.

## DISCUSSION

A.    Motion for Rehearing

Petitioner filed a pleading captioned "Motion for Rehearing of Preliminary Injunction and Restraining Order."  In his motion, petitioner requests that the court "relinquish the powers and authority of the state in reference to me in my individual capacity and restrain the State of North Carolina from receiving any funds, security or bonds as a holding on my behalf or for the purpose of facilitating me."  (DE 34, p. 4).  Petitioner additionally requests several accommodations including, but not limited to, an immediate transfer, an expert in financing, and the ability to allocate his own food service.  (Id. p. 5).

A movant must establish the following to obtain a temporary restraining order or a preliminary injunction: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008).

Here, petitioner has not demonstrated that he likely is to succeed on the merits, nor has he alleged facts necessary to demonstrate that he likely would suffer irreparable harm if his motion is not granted.  Finally, petitioner has not demonstrated that his request for a temporary restraining order is in the public interest or that the balance of equities tips in his favor.  Accordingly, petitioner's motion for a temporary restraining order is DENIED.

B.    Summary Judgment

    1.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

The standard of review for habeas petitions brought by state inmates, where the claims have been adjudicated on the merits in the state court, is set forth in 28 U.S.C. § 2254(d). That statute states that habeas relief cannot be granted in cases where a state court considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or the state court decision was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(1) and (2). A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal principle from [the Supreme] Court's cases but unreasonably applies it to the facts of the state prisoner's case." Id. at 407. A state court decision also may apply Supreme

Court law unreasonably if it extends existing Supreme Court precedent to a new context where it does not apply, or unreasonably refuses to extend existing precedent to a new context where it should apply.  Id.  The applicable statute

> does not require that a state court cite to federal law in order for a federal court to determine whether the state court's decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000), cert. denied, 534 U.S. 830 (2001).  Moreover, a determination of a factual issue made by a state court is presumed correct, unless rebutted by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).

      2.     Analysis

      a.     Competence to Proceed Pro Se at Trial

In his first claim, petitioner asserts that he was not competent to represent himself at trial. Petitioner raised this claim in his direct appeal, and the court of appeals found the claim to be meritless.  In making its determination, the court of appeals ruled that petitioner was competent to stand trial, voluntarily and knowingly waived his right to counsel, and that the trial court "had no basis to deny defendant his constitutional right to represent himself."  Grady, 2016 WL 2659505 at

* 7-11.[1]  With respect to whether petitioner voluntarily and knowingly waived his right to counsel, the court of appeals reasoned as follows:

> In [Indiana v. Edwards, 554 U.S. 164 (2008),] the United States Supreme Court considered the situation of "a criminal defendant [who] has sufficient mental competence to stand trial" but "lacks the mental capacity to conduct his trial defense unless represented." 554 U.S. at 174, 171 L. Ed.2d at 355, 128 S. Ct. at 2385–86. The Supreme Court concluded that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under Dusky [v. United States, 362 U.S. 402, 4 L. Ed 2d 824, 80 S. Ct. 788 (1960) (per curiam ) ] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." Id. at 178, 171 L. Ed.2d at 357, 128 S. Ct. at 2388.  Ultimately, the Supreme Court held in Edwards that a state's refusal to allow a "gray-area" defendant to conduct his own defense at trial does not violate the Constitution.  Id. at 177–78, 171 L. Ed.2d at 357, 128 S. Ct. at 2387–88.

Grady, 2016 WL 2659505, at *7.  The court of appeals further held that North Carolina state law provides that "an inquiry under Edwards into a defendant's competency to represent himself is only required if the trial court denies the defendant's right to represent himself."  Id. (emphasis in original) (citing Indiana v. Edwards, 554 U.S. 164 (2008); State v. Lane, 365 N.C. 7, 23 (2011)).  Based upon the foregoing, the court of appeals determined that a separate hearing as to petitioner's competency to represent himself at trial was not required.  (Id.)

It is undisputed that a criminal defendant has the right to represent himself pursuant to the Sixth Amendment of the United States Constitution.  Faretta v. California, 422 U.S. 806, 818 (1975).

_____

[1]  Even if petitioner did contest the knowing and voluntary nature of his waiver of counsel, the record establishes the petitioner knowingly and voluntarily waived his right to proceed with counsel.  See Grady, 2016 WL 2659505 at *10; see also, Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992) ("Unsupported, conclusory allegations do not entitle habeas petitioner to an evidentiary hearing."), overruled on other grounds by, Gray v. Netherland, 518 U.S. 152, 165-66 (1996).

The Fourth Circuit Court of Appeals recognized that "after Edwards, at least one relevant consideration for a district court in determining whether or not to force counsel on a mentally ill defendant is whether a defendant who is otherwise able to satisfy the competence standard may nonetheless be unable to carry out the basic tasks needed to present his own defense without the help of counsel." United States v. Bernard, 708 F.3d 583, 589-590 (4th Cir. 2013) (internal quotations omitted). The court in Bernard further held:

> By its plain terms, Edwards held only, "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." Id. (emphasis supplied). This language is permissive rather than a pronouncement of a requirement in these circumstances. Thus, while the district court was not compelled to find Appellant competent to waive his right to counsel simply because the court had found him competent to stand trial, it does not follow that the district court was barred from doing so.[] To the contrary, Edwards itself reaffirmed that a court may constitutionally permit a defendant to represent himself so long as he is competent to stand trial. See id. at 173, 128 S. Ct. 2379 ("For another thing, Godinez involved a State that sought to permit a gray-area defendant to represent himself. Godinez 's constitutional holding is that a State may do so. But that holding simply does not tell a State whether it may deny a gray-area defendant the right to represent himself—the matter at issue here." (emphases in original)). Appellant conceded at oral argument that no court has read Edwards differently.[]
>
> At bottom, Edwards does not stand for the proposition that a state must deny the right of self-representation to a defendant of questionable mental competence or that district courts must conduct an additional "Edwards" inquiry into the competency of every defendant who requests to proceed pro se. It is therefore permissible for a trial court, having found a mentally ill defendant competent to stand trial, to determine him to be competent to waive his Sixth Amendment right to counsel.

Id. p. 590.

Here, petitioner does not contest his competency to stand trial, and has not produced evidence to show that he was not competent to stand trial. Based upon the foregoing, the court finds that the court of appeals properly determined that petitioner waived his right to counsel and that the trial court had no basis to deny petitioner's right to self-representation. Although petitioner "conduct[e]d his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" Faretta, 422 U.S. at 834 (quoting Illinois v. Allen, 397 U.S. 337, 350-51 (1970)). Accordingly, the state court proceedings were neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, nor was the state court decision based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

b.      Mental Capacity to Commit the Crime

In his second claim, petitioner asserts that he lacked the mental capacity to form the requisite specific intent to carry out the offenses for which he was convicted. Petitioner did not raise this claim on direct review.

Absent a valid excuse, a state prisoner must exhaust his remedies in state court before seeking federal habeas corpus relief. See 28 U.S.C. § 2254(b). To satisfy the exhaustion requirement, an inmate must fairly present his claims to the state court. This exhaustion requirement compels a habeas petitioner to "invok[e] one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). In North Carolina, a petitioner may satisfy the exhaustion requirement of § 2254 by directly appealing his conviction to the North Carolina Court of Appeals and then petitioning the Supreme Court of North Carolina for

discretionary review, or by filing a MAR and petitioning the North Carolina Court of Appeals for a writ of certiorari. See N.C. Gen. Stat. §§ 7A–27, 7A–31, 15A–1422. A habeas petitioner has the burden of proving that a claim is exhausted. Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994).

A claim that has not been adequately presented to the state courts may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner now attempted to present it. Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000); Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). A claim treated as exhausted and consequently procedurally defaulted because it now would be procedurally barred in state court can overcome the default if the petitioner can demonstrate cause and actual prejudice and/or a miscarriage of justice. Baker, 220 F.3d at 288 (citing Gray v. Netherland, 518 U.S. 152, 162 (1996)); see also Coleman v. Thompson, 501 U.S. 722, 750 (1991). To show cause, a petitioner must show something external prevented him from complying with the state procedural rule. Coleman, 501 U.S. at 753. To show prejudice, a petitioner must show he was actually prejudiced as a result of the alleged violation of federal law. United States v. Frady, 456 U.S. 152, 168 (1982).

In this case, petitioner did not raise his claim contending that he did not have the requisite specific intent to carry out the offenses for which was convicted on direct appeal, but was in an adequate position to do so. Petitioner did raise this issue in his petition for discretionary review filed in the North Carolina Court of Appeals. However, raising a claim for the first time on discretionary review does not constitute fairly presenting his claim to the state courts. See Castille v. Peoples, 489 U.S. 346, 351 (1989) (raising a claim for the first and only time in a procedural context in which the merits will not be considered absent "special and important reasons" does not constitute "fair

presentation."); cf. Felton v. Barnett, 912 F.2d 92, 94–95 (4th Cir. 1990) (noting that certiorari is a form of discretionary review and the denial of certiorari often has nothing to do with the merits).

As a result of not properly raising his current claims in state court, petitioner now is procedurally barred from raising them in state court. See N.C. Gen.Stat. § 15A–1419(a)(3) (stating that habeas claim should be denied, absent cause and prejudice, when defendant was in adequate position to have raised it on direct appeal, but did not do so); Rose v. Lee, 252 F.3d 676, 683 (4th Cir. 2001) (holding § 15A–1419 is mandatory); Williams v. French, 146 F.3d 203, 208–09 (4th Cir. 1998) (holding § 15A–1419(a)(3) to be an independent and adequate state procedural bar, precluding federal habeas review); McCarver v. Lee, 221 F.3d 583, 588–89 (4th Cir. 2000) (holding § 15A–1419(a)(3) is an independent and adequate state procedural bar). Accordingly, this court may not review the merits of petitioner's claims unless he can demonstrate "good cause" and "actual prejudice," or that he suffered a "fundamental miscarriage of justice." N.C. Gen. Stat. § 15A–1419(b).

In support of his allegation that he had good cause for not raising this issue on direct appeal, petitioner alleges that he attempted to raise the issue before the court of appeals, but that it was ignored by his counsel. The Sixth Amendment right to counsel includes the right to the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that counsel's representation was objectively unreasonable and that a reasonable probability exists that, but for the attorney's error, he would have prevailed on his appeal. Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland, 466 U.S. at 687–88). Appellate counsel is not required to assert all non-frivolous issues on appeal, "but rather may select from among them in order to maximize the likelihood of success

on appeal." Smith, 528 U.S. at 288. Reviewing courts must presume that in determining which issues to appeal, appellate counsel selected those issues most likely to afford relief. Pruett v. Thompson, 996 F.2d 1560, 2568 (4th Cir.1993).

In this action, the trial court determined that plaintiff had the mental capacity to form the requisite intent to carry out the offenses at issue. (Resp't's Mem. Ex. 1-D, pp. 26-27; 30-36, 47). Petitioner has not presented any evidence to the contrary. See Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992) ("Unsupported, conclusory allegations do not entitle habeas petitioner to an evidentiary hearing."), overruled on other grounds by, Gray, 518 U.S. at 165-66. As a result, petitioner has not established cause for his procedural default, and his claim is procedurally barred.[2]

c.      Conditions of Confinement

In his third claim, petitioner contends that his conditions of confinement are constitutionally inadequate and fail to satisfy his "special needs." (Pet. p. 7). Habeas corpus relief is not appropriate when a prisoner challenges the conditions of his confinement. See Preiser v. Rodriquez, 411 U.S. 475, 499 (1973). A prisoner challenging the conditions of his confinement must bring his claims pursuant to 42 U.S.C. § 1983 (if a state inmate) or Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) (if a federal inmate). Id.; see Wilson v. Johnson, 535 F.3d 262, 265 (4th Cir. 2008). Thus, in order to challenge his conditions of confinement, petitioner, a federal inmate must file an action pursuant to 42 U.S.C. § 1983. Thus, this claim is DISMISSED without prejudice. The clerk of court is DIRECTED to send petitioner the civil rights package.

---

[2] To the extent petitioner contends that he was not competent to stand trial, this claim too is procedurally defaulted for the reasons set forth above.

d.    New Claims

Petitioner alleges several conclusory allegations in his various responsive pleadings.  To the extent these claims are separate from the claims discussed supra, they constitute nothing more than conclusory allegations which do not entitle a habeas petitioner to an evidentiary hearing.  Jones v. Polk, 401 F.3d 257, 270-271 (4th Cir. 2005); Nickerson, 971 F.2d at 1136; see also, Miles v. Owen, No. 4:12–998–MGL, 2013 WL 227766, at *2 (D.S.C.  Jan. 22, 2013) ("The Court ... declines to address Petitioner's new claims which he raises for the first time in his response and sur-reply.  To the extent that Petitioner's response in opposition to the motion to dismiss presents issues and claims not contained in his Petition, these claims are not properly before the court.")  Thus, any new claims asserted in petitioner's responsive pleadings or miscellaneous filings are not properly before the court and have not been considered.  As a result, such claims are DISMISSED without prejudice.

C.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") provides "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Having determined petitioner is not entitled to relief and respondent is entitled to dismissal of the petition, the court considers whether petitioner is nonetheless entitled to a certificate of appealability with respect to one or more of the issues presented in his habeas petition.

A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Where a petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, "the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further.' " Buck v. Davis, No. 15-8049, 2017 WL 685534, at *11 (Feb. 22, 2017) (quoting Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003)); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

Where a petitioner's constitutional claims are dismissed on procedural grounds, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition [or motion] states a valid claim of denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" Rose v. Lee, 252 F.3d 676, 684 (4th Cir. 2001) (quoting Slack, 529 U.S. at 484). "Each component of the § 2253(c) showing is part of a threshold inquiry, and a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." Slack, 529 U.S. at 484-85.

After reviewing the claims presented in the habeas petition in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and none of the issue are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is DENIED.

## CONCLUSION

For the foregoing reasons, the court orders as follows:

1) Petitioner's motion for rehearing (DE 34) is DENIED;

2) Respondent's motion for summary judgment (DE 21) is GRANTED. To the extent petitioner has asserted new claims in response to respondent's motion for summary judgment, such claims are DISMISSED without prejudice;

22

3)      A Certificate of Appealability is DENIED;

4)      The clerk of court is DIRECTED to send petitioner the civil rights package;

5)      The clerk is DIRECTED to close this case.

SO ORDERED, this the 11th day of July, 2017.




_____
LOUISE W. FLANAGAN
United States District Judge